**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS CIESIELSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14 C 10073** |
| | ) | |
| **JP MORGAN CHASE & CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Thomas Ciesielski has sued his former employer JP Morgan Chase & Co. for alleged violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112(b)(4); the Illinois Human Rights Act, 775 ILCS 5/1-101; and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601. He claims that Chase terminated his employment because of his association with his wife who had cancer and his usage of FMLA leave. Chase has moved for summary judgment, arguing that no reasonable jury could find that it violated the ADA or FMLA when it terminated Ciesielski. Chase also argues that the IHRA does not encompass association-type claims. For the reasons stated below, the Court grants Chase's motion for summary judgment.

### Background

The Court examines the facts and draws reasonable inferences in the light most favorable to Ciesielski. *See Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). On June 13, 2011, Chase hired Ciesielski to serve as an Assistant Vice

President, Real Estate Design Manager on the Architecture, Design, and Engineering (AD&E) team. His primary responsibilities included ensuring that the team's projects remained in compliance with various legal codes, including the ADA. To do this, he was tasked with interpreting the codes and distilling them down so that the AD&E team could easily apply and adapt them to projects. In particular, Ciesielski was responsible for refining the structure of Chase's existing Master Services Agreement (MSA), which Chase used with its outside architectural vendors and which was set to expire around December 31, 2012.

Ciesielski initially reported to Michael Meyer, who transferred his direct supervisory responsibility to Keith Janda several months after Ciesielski's hiring. In Ciesielski's year-end 2011 performance review, Janda noted that Ciesielski was meeting many performance expectations while needing to advance more quickly on others. In particular, Janda noted that "2012 will be [Ciesielski's] time to grab the reigns [sic] and continue to further establish himself as a critical resource not only to the AD&E team but the Retail Distribution Network as a whole. Success in this endeavor will require a higher degree of confidence, leadership, and independence." Ciesielski Dep. Ex. 11.

These comments were reiterated in Ciesielski's year-end 2012 performance Review, with Janda noting that he looked forward to Ciesielski "assuming a more proactive and independent approach to determining how and where his knowledge, skills and interests are best applied." Ciesielski Dep. Ex. 13. In that review, Janda also noted that he expected Ciesielski to "continue to explore ways to consolidate the large volumes of very technical information that typically comes with his analyses into more

easily understood summaries and/or diagrams that are specifically adapted to the particular issue at hand." *Id.* Janda concluded by clarifying that although Ciesielski consistently met expectations and was a solid and dependable performer, he had been "given the benefit of time to get comfortable and find his way in the large corporate environment that [was] very new to him," and that benefit was effectively ending. Ciesielski testified that he found the two Year-End reviews appropriate and fair, respectively. Ciesielski Dep., 81:10-12; 90:13-14.

A series of e-mail exchanges in 2012 and 2013 indicated that Ciesielski continued to face difficulty making independent decisions after the year-end reviews. On September 17, 2012, Janda responded to one of Ciesielski's e-mails seeking assistance in deciding on a deadline extension by reminding Ciesielski that he was "supposed to own th[e] initiative" and that he should "make a call" because he "knew the detailed timeline and dates." Janda Dec. Ex. 1. In another e-mail on February 4, 2013, Janda once again reminded Ciesielski that the project for which he was seeking guidance was "[his] to run with." Janda Dec. Ex. 2. Janda signaled his desire for Ciesielski to take more initiative, clarifying that he was "happy to provide input when needed," but asking Ciesielski to refrain from "inhibit[ing] progress by waiting to fit things into [Janda's] schedule." *Id.*

On February 21, 2013, Ciesielski notified Janda that he would be leaving work early for medical reasons. Janda responded expressing his hope that everything was okay and noting that he would see Ciesielski the next day. Ciesielski followed up by nothing that it was not his own medical issue but rather an issue involving someone very close to him. He did not provide any further indication of the identity of the person

who was ill or the extent of the illness, and Janda did not ask.  On March 13, 2013,

Ciesielski asked to work at home for two days, without explaining the reasoning behind

his request.

Janda and Ciesielski met for Ciesielski's first quarter review on March 21, 2013.

In that review, Janda once again stressed the importance of simplifying technical

information and taking more independence and initiative.  He also referenced concerns

he had with Ciesielski's time and attendance, which was not up to par with Chase's

expectations.  He placed Ciesielski on a performance improvement plan (PIP) in an

effort to "hopefully inspire better performance on specific areas on concern outlined" in

the review.   Janda Dep. 42:4-22.  Janda issued a report memorializing the things

discussed in the meeting.  That report enumerated "areas of concern," including:

1. QUALITY/CLARITY OF COMMUNICATIONS

Despite repeated feedback, communications produced by Tom are
still extremely complex, hard to follow and not easily understood by
those that are the intended audience.

. . .

This concern has been raised previously related to other
communications that Tom has authored related to code
interpretations and the like.

2. LACK OF INDEPENDENCE/OWNERSHIP OF ASSIGNED
TASKS

Despite the generous amount of time that Tom has been allotted,
he has yet to take a leadership role as the subject matter expert he
was hired to be.

. . .

Others are still required to do things that are a part of Tom's role
and responsibilities as the point person on initiatives assigned to
him

3. ABILITY TO REPRESENT THE TEAM ON CALLS AND IN MEETINGS WITH BROADER AUDIENCES

Congruent to the previous two areas of concern above, Michael and I expressed serious concerns about Tom's ability to represent the AD&E team in an acceptable manner.

Specific Example Cited: *Award/Declination Calls* with firms that took part in the RFP for Architectural and Design Services. Michael took part in this 3-hour call – in part to audit Tom's participation as the lead on this initiative – and found that Tom's participation was almost non-existent.

His serious concerns were exacerbated by the fact that Tom dropped from the call 1/3 of the way into the call after indicating that he had "too much to do".

Demonstrative Situation Cited: If called upon to do so, Michael expressed that he would not have the confidence to send Tom singularly to BDG Architects or Gensler (current vendors) to represent the AD&B Team in negotiations related to their Master Service Agreements.

4. TIME AND ATTENDANCE

Michael expressed concerns about the perception that Tom is not working at full capacity and not dedicating the time necessary to complete tasks in an acceptable and timely manner.

When Michael posed questions about Tom's regular work hours he indicated that he regularly gets in "around 8:40" and has only come in after 9 AM "on occasion". Based on my observations and conversations with co-workers that sit in close proximity to Tom, Tom regularly gets in around 9 AM and rarely works past 5 PM. Michael indicated to Tom that he needs to work a full day (8 AM to 5 PM).

Ciesielski Dep. Ex. 14. Under the PIP, Ciesielski was required to complete a series of enumerated tasks related to his projects within 30 day cycles, with reviews scheduled at the 30 day, 60 day, and 90 day marks. The report indicated that if Ciesielski did not meet the PIP's requirements according to the specified timeline, management at Chase

would take steps to transition him out of his role and remove him from the AD&E team.

Although the parties disagree on the exact date that Janda learned of Ciesielski's wife's illness, they agree that Janda did not know she had cancer at the time of Ciesielski's first quarter review. Either directly after the review or several weeks afterward, Ciesielski notified Janda of his wife's illness and his need for more time off. *See* Ciesielski Dep. 149:4-150:12 (stating that he informed Janda of his wife's illness directly after the meeting on March 21); Janda Dep. 45:2-45:8 (recalling Ciesielski informing him of his wife's illness subsequent to the first quarter review meeting); Meyer Dep. 58:7-23 (denying knowledge of Ciesielski's wife's illness before the March 21 meeting; estimating that he first learned of it sometime between late March and early April).

On April 3, 2013, Ciesielski sent Janda an e-mail requesting time off to care for his wife. In the weeks that followed, Ciesielski continued to request days off, finally clarifying on April 16 that he intended to take leave as provided under Chase's family and medical leave policy. He specified that he would use three of his allotted sick days in May and would then begin using his family and medical leave, taking two additional days in May, three in June, and two in July. On April 19, Chase's Disability Management Services (DMS) e-mailed Janda indicating that Ciesielski had formally requested FMLA leave that day.

On April 20, Ciesielski and Janda met for Ciesielski's 30 day follow up. In that meeting, Janda indicated that certain goals were met but not others. In particular, Janda noted that Ciesielski reorganized and re-formatted information in an ADA compliance document so that it was clearer, more concise, and more easily

understandable by the target audience.  But by the time of the meeting, Ciesielski had

not yet formally presented that document to the relevant parties.  Additionally, he "made

a mad scramble" to get particular contracts in place as mandated by the PIP.  After

discussing his progress, Ciesielski and Janda discussed the 60 day action items that

Ciesielski was set to complete by May 20.  Ciesielski agreed that he could complete the

assigned tasks according to the relevant timeline.  Ciesielski submitted a written

response to the first quarter review, in which he disputed many of Janda's concerns but

also acknowledged that he could improve by simplifying technical information and

increasing the quality of coordination between team members.

On May 30, Janda e-mailed Meyer with a proposed 60 day review for Ciesielski,

and Meyer instructed him to convert it into a written warning.  Janda did so that same

day and sent it to Meyer and a human resources representative named Janice Morris

for review.  Morris supported the written warning and instructed Janda to pass it along

to Lesley Maier, another HR representative, for finalization.  Maier approved the final

written warning on June 5.  On June 14, after a delay caused by scheduled vacation

and sick days, Janda presented the written warning to Ciesielski via e-mail.  The written

warning read, in part:

> Since receiving his 1st Quarter Performance review on 03/21/13 (See
> Attached) and being put on a slightly modified version of the JPMC
> Performance Improvement Plan (PIP) Tom has not demonstrated
> significant and sustained improvement related to his performance. The
> sense of urgency that was clearly demonstrated in the last few days
> leading up to the established 4/1/13 deadline for having all for the new
> MSAs executed has subsided. Tom has re-assumed a job profile of simple
> tasks, low demand and prolonged timelines which is inconsistent with the
> expectations of his level and that of the leadership role he was brought on
> to assume.

Ciesielski Dep. Ex. 18.  The written warning also reiterated specific action items

Ciesielski had been tasked with but had failed to complete, noting that immediate and sustained improvement in performance was expected.

Ciesielski inquired about the process for rebutting the written warning, and on July 8 he submitted his response to HR representative Blackburn. He explained why he had failed to meet some of the criteria in his 30/60/90 day plan and highlighted the efforts he made. Ciesielski also cited his self-authored list of 2012 accomplishments as a counter to Janda and Meyer's assessment that he did not perform critical functions of his role. In short, he highlighted parts of his performance that were not at issue in the performance reviews or 30/60/90 day plan.

Upon her receipt of the rebuttal, Blackburn conducted an investigation regarding Meyer and Janda's supervision of Ciesielski. Ciesielski indicated to Blackburn that he acknowledged his weaknesses related to writing and fine-tuning his presentations. He also indicated that he partially agreed with his managers' assessments of his shortcomings. Blackburn also interviewed Meyer and Janda, and she ultimately concluded that there was no evidence to substantiate Ciesielski's claim. Still, she directed Ciesielski to report any further concerns to HR.

Throughout the period between the issuance of the PIP and Ciesielski's ultimate termination, he requested several absences, some related and to his wife's illness and some unrelated. For example, on June 20, Ciesielski updated his calendar to take four vacation days in July, with two more FMLA days scheduled for the end of June. On August 21, 2013, he notified Janda that he would be taking the next two days off to attend his nephew's wedding and the following Monday as a scheduled FMLA day. In his response to Ciesielski, Janda insinuated that Ciesielski had not given advance

notice for the non-FMLA absences and asked Ciesielski to give at least two weeks' advance notice for future vacation requests. Ciesielski also testified that he missed a meeting one day before a scheduled absence, admitting that he had not sought prior approval for that particular day's absence.

On August 19, 2013, Meyer tasked Janda with populating a chart detailing his employees' competency ratings in nine performance categories. Janda did so, ranking the team members in relation to the other members of the team. Ciesielski ranked lowest overall. Janda testified that no one explained to him the purpose of the rankings, which would eventually determine which employees would be terminated as a part of a firm-wide reduction-in-force. Upon receiving Janda's rankings in September, Meyer made the decision to include Ciesielski and his colleague John Robert in the reduction-in-force. Meyer declared that he reached his decision based on a number of factors, including the fact that Ciesielski and Robert were the only AD&E team members who were under PIPs. Meyer also translated the rankings from his internal charts to a chart used by his superior Martino. Ultimately, Meyer's based his decision to rank Ciesielski last among his team members on Ciesielski's 2012 rating, his 2013 performance counseling, a translation of the competency ratings chart and his own personal knowledge of Ciesielski's abilities.

On September 19, 2013, an HR representative officially recommended Ciesielski and Robert to be added the RIF list, along with over 250 other Chase employees. During a call with Martino on or about September 23, Ciesielski learned of his inclusion in the RIF. Martino also informed Ciesielski of his right to participate in the Chase Talent Reassignment Program, which would allow him to secure another position within

Chase if possible.  But Ciesielski was unable to secure such a position.  Ciesielski continued taking time off both for FMLA and non-FMLA reasons.  On October 22 and 23, Ciesielski indicated that he would not be in the office because he was fighting the flu.  On October 24, he notified Janda that he would be leaving the office early for an outside meeting. Ultimately, Ciesielski's employment with Chase ended on December 31, 2013.  Throughout the RIF process, Ciesielski did not discuss his termination with Janda or Meyer.

Ciesielski filed this action on December 16, 2014, claiming Chase discriminated and retaliated against him based on his association with his sick wife and his usage of FMLA leave.  Chase contends that it terminated him for legitimate, non-discriminatory reasons unrelated to his FMLA leave or his wife's illness.  Chase has moved for summary judgment on all of Ciesielski's claims.

### Discussion

Summary judgment is proper if the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, the Court construes all genuinely disputed facts in the light most favorable to the non-movant and draws all reasonable inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 378-80 (2007).  However, the non-moving party must present more than just bare allegations—it must present evidence on which the jury could reasonably find in its favor.  *See, e.g.*, *de la Rama v. Ill. Dept. of Human Servs.*, 541

F.3d 681, 685 (7th Cir. 2008).

Chase has moved for summary judgment on all of Ciesielski's claims.  It argues that Ciesielski's ADA claim fails because no reasonable jury could find that his termination violated one of the three categories of association discrimination barred by the ADA.  In particular, Chase contends that no reasonable jury could find that Chase terminated him based on a concern that his wife's illness distracted him at work—which was the only association claim Ciesielski pursued.  It also argues that no reasonable jury could find that Chase's stated reasons for termination were pretextual. With regard to Ciesielski's FMLA claim, Chase argues that no reasonable jury could find that Ciesielski's FMLA leave caused Chase to terminate him.  At the outset, the Court notes that Ciesielski failed to respond to Chase's arguments regarding his IHRA claim, thereby forfeiting that claim.  *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011). For this reason, the Court grants summary judgment in Chase's favor on the IHRA claim in Count 1.  The Court addresses the rest of the arguments in turn.

## 1.     ADA association claim

The ADA prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  The Seventh Circuit has outlined three categories into which "association discrimination" claims fall:  expense, disability by association, and distraction.  *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012). The categories can be described as follows:

> An employee is fired (or suffers some other adverse personnel action)
> because (1) ("expense") his spouse has a disability that is costly to the

employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours. The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.

*Larimer v. IBM Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

The Seventh Circuit endorsed a modified *McDonnell Douglas* test for association discrimination claims, stating that a plaintiff can prove his prima facie case by establishing: 1) he was qualified for the job at the time of the adverse employment action; 2) he was subjected to an adverse employment action; 3) at the time, his employer knew he had a relative or associate with a disability; and 4) his case falls into one of the three relevant categories of expense, distraction, or association. *Magnus*, 688 F.3d at 336-37. If a plaintiff establishes a prima facie case, his employer has the opportunity to present legitimate, non-discriminatory reasons for his termination. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *see Magnus*, 688 F.3d at 338 (noting an employer's legitimate, non-discriminatory reasons for termination in a disability discrimination case). If the employer does so, the plaintiff must demonstrate that the employer's proffered reason was pretextual. *McDonnell Douglas*, 411 U.S. at 805; *see Magnus*, 688 F.3d at 339 (noting the plaintiff's failure to show that her employer's reason for terminating her was "a lie to cover up for associational

discrimination").

Ciesielski claims that Chase discriminated against him based on his known association with his sick wife.  Specifically, he asserts a distraction-type claim, arguing that Chase fired him based on his absences related to spousal care and its expectation that they would continue.   Ciesielski contends that he was qualified for his position at the time of his negative reviews and eventual termination.  He points to positive aspects of his previous evaluations and performance reviews and argues that his managers did not communicate any negative reviews of his work until after he disclosed his wife's illness.  He argues that several of Chase's reasons for terminating him—"a dropped phone call, occasional late arrivals, and a less aggressive travel schedule derived solely from his wife's cancer," Pl.'s Resp. 6—fall squarely into the distraction category of ADA association claims.

Ciesielski admits that his attendance suffered after his wife got sick.  Particularly, he testified that he communicated to Janda that he would be unable to work 40 hours per week.   Ciesielski Dep. 104:8-19. He also testified that he took a considerable amount of days off—some sanctioned and some not.  *Id.* 176:6-177:17.  The ADA does not excuse Ciesielski's absences despite their relation to his wife's disability. Associational discrimination claims are unlike others under the ADA because employers are not required to provide reasonable accommodations to non-disabled workers. *Larimer*, 370 F.3d at 700 ("[T]he right to an accommodation, being limited to *disabled employees*, does not extend to a nondisabled associate of a disabled person").  As a result, an employee who cannot meet the attendance requirements of his job is not protected by the ADA's prohibition against association discrimination.  *Id.*  And although

the ADA prohibits employers from taking adverse action against an employee based on unfounded assumptions about his need to care for a disabled person, it does not prohibit employers from disciplining *actual* workplace policy violations. *Magnus*, 688 F.3d at 337. To the contrary, an employer may discipline its employee for violating a neutral employer policy concerning attendance or tardiness, even if the violation is to care for the disabled spouse. *Id.*

Ciesielski argues that the Seventh Circuit's association discrimination jurisprudence is "ongoing" and that the Court should consider persuasive authority from elsewhere because it "provides a more thorough analysis of Plaintiff's unique claim." Pl.'s Resp. 4. First, the Court disagrees that it should side-step the Seventh Circuit's clearly laid out modification to the *McDonnell Douglas* test simply because the Seventh Circuit has struggled to develop it. But even considering the persuasive authority cited by Ciesielski, the Court cannot identify a route to success for his claim. In one of Ciesielski's proffered cases, summary judgment was granted for the employer because the plaintiff-employee did not meet her burden of proof. *Dees v. Office Mgmt. Servs., Inc.*, No. 1:10-cv-260, 2012 WL 640695, *3 (N.D. Miss., Feb. 27, 2012) ("In the case herein, [the plaintiff] failed to fully rebut the defendant's reasons for terminating her . . . As [the plaintiff] fails to meet her burden, summary judgment is proper"). In another, an employer's motion for judgment on the pleadings was denied as it related to the association discrimination claims therein because the standard for such motions is more lenient than that applied on summary judgment motions. *Young v. Cooper Lighting, Inc.*, No. 5:07-cv-211, 2008 WL 4491396, *2 (S.D. Miss., Oct. 1, 2008). There, the plaintiff-employee alleged that his former employer terminated him based on unfounded

14

beliefs about his need to care for his wife. *Id.* That allegation was enough to survive the motion, which addressed only the parties' allegations, not the evidence adduced. *Id.* The posture of that case does little for Ciesielski, who, at the summary judgment stage, must present more than mere allegations. *See Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) ("If the moving party meets [its summary judgment] burden, the nonmoving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial").

In another case cited by Ciesielski, the Fourth Circuit affirmed a grant of summary judgment for the employer, finding no merit in the plaintiff's contention that her employer fired her based on unfounded assumptions of her need to miss work to care for her son. *Tyndall v. Nat'l Educ. Centers Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994). There, the employer terminated the plaintiff based on a record of absences in connection with her disabled loved one's care. *Id.* Because Chase's reasoning for terminating Ciesielski is based on more than just his unapproved absences and includes undisputed performance problems and a long record of critiques and demands for more independent action on his behalf, it is even *less* likely that a reasonable jury could find in plaintiff's favor here than was the case in *Tyndall*.

Ciesielski's primary ADA argument—that Chase made the decision to terminate him based on an unfounded assumption regarding his need to care for his disabled wife—is not supported by the evidence. Instead, the undisputed evidence establishes that Ciesielski failed to meet Chase's performance expectations over the course of several years. Well before Ciesielski's wife fell ill, Chase implored him to take more initiative and independence. Ciesielski's performance reviews—many of which predate

his wife's illness—document his failure to improve according to Chase's standards. Considering these deficiencies along with Ciesielski's admitted attendance issues, no reasonable jury could infer that Chase terminated him for a prohibited reason. "Summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's poor job performance." *Id.* Despite his demonstration of his success in other aspects of his job not at issue, Ciesielski has admitted to many of the behaviors Chase cites as legitimate reasons for termination. In particular, Ciesielski admitted to arriving to work late and excusing himself from meetings when he was expected to be at work. *See* Ciesielski Dep. 97:24-98:4; 104:8-19; 176:6-177:17. And he admitted that the criticisms of his work product that predated Chase's awareness of his wife's cancer were reasonable. *See* Ciesielski Dep., 81:10-12; 90:13-14. In sum, no reasonable jury could find that the legitimate, non-discriminatory reasons that Chase has articulated for terminating Ciesielski were pretextual. Based on the undisputed facts, summary judgment for the defendant is proper on the ADA claim.

**2.     FMLA retaliation claim**

The Family and Medical Leave Act provide eligible employees with twelve weeks of unpaid leave during any twelve-month period to care for a spouse if such spouse has a serious health condition. 29 U.S.C. § 2612(a)(1)(C). An employer is prohibited from retaliating against an employee who exercises or attempts to exercise his FMLA rights. *Id.* § 2615(a)(2). "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012).

A plaintiff asserting a retaliation claim under the FMLA may proceed under the direct or indirect method of proof. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Ciesielski proceeds using the direct method. *See* Pl.'s Resp. at 6. Under the direct method, a plaintiff must establish that 1) he engaged in a protected activity; 2) his employer took an adverse action against him; and 3) there is a causal connection between his protected activity and his employer's adverse employment action. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 633 (7th Cir. 2009). The employee may rely on either direct evidence (usually some form of admission by the decision maker of his retaliatory intent) or circumstantial evidence (which would allow the factfinder to infer intentional discrimination by the decision maker). *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008).[1]

Chase does not dispute that Ciesielski has satisfied the first element of the FMLA retaliation test—he took FMLA leave, which is protected activity. *See* 29 U.S.C. § 2615(a)(2). And although it is well established that performance improvement plans and negative performance reviews do not alone constitute an adverse employment action, *see, e.g.*, *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003), Ciesielski's termination was undoubtedly an adverse employment action that satisfies the second element. *See Pagel*, 695 F.3d at 631.

The parties' dispute turns on the third element of the test—causation. Ciesielski argues that Chase terminated him because he took FMLA leave, and Chase puts forth non-discriminatory reasons for Ciesielski's termination. Ciesielski has offered no direct

---

[1] Ciesielski does not proceed under the indirect method of proof. *See* Pl.'s Resp. at 8 (Noting that "plaintiff's claim soundly prevails under the direct method" and failing to include an alternative indirect method argument).

evidence of causation, so the Court examines the record for circumstantial evidence. Ciesielski contends that Chase began taking steps to terminate him only after he informed his managers of his wife's illness and his intention to take FMLA leave. He argues that this timing—particularly the closeness in time between what he perceived to be his first negative review and his FMLA notice—gives rise to a circumstantial inference of retaliation. He also argues that Chase included negative reports in his reviews only in an effort to cover up its true aim of retaliation.

Though not adverse employment actions themselves, the PIP and negative performance reviews leading up to Ciesielski's termination are material to the extent that they constitute "evidence of discrimination or . . . evidence at the pretext stage to suggest that the defendant's legitimate reasons for the plaintiff's termination are unworthy of belief or somehow tainted." *Id.* Although the exact date of notification is unknown, Ciesielski does not dispute that Janda was unaware of his wife's illness at the time he placed Ciesielski on the PIP during the first quarter review. Rather, Ciesielski testified that Janda became aware of his wife's illness just after the first quarter review meeting. "A decline in performance before the employee engages in protected activity does not allow for an inference of retaliation." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 354 (7th Cir. 2009). Put simply, "an employer cannot retaliate if there is nothing for it to retaliate against." *Long*, 585 F.3d at 354. Similarly, based on the sequence of events, no reasonable jury could find that Janda placed Ciesielski on the PIP based on his exercise of his rights under the FMLA.

Ciesielski argues, however, that the frequency and volume of his negative reviews increased after he advised Janda of his wife's illness. Although Ciesielski

contextualizes his first quarter review as if it were the first negative review he had received, no reasonable jury would be able to find support for that theory in the evidence.  Instead, looking at the criticisms expressed in that meeting in combination with his previous year end reviews, a consistent and longstanding pattern emerges.  Although, over the years, Janda used different words and sometimes was more insistent than others, he repeatedly pressed Ciesielski to take more initiative and independence and to simplify the complex aspects of his work product.  Directives of this sort date back to the 2011 year end performance review, far before any indication that Ciesielski would need to use FMLA leave.  Given that Ciesielski relies on circumstantial evidence, a reasonable jury would need to be able to infer retaliation from the evidence adduced.  And, as the Court has indicated, a decline in job performance before an employee engages in a protected activity does not allow for an inference of retaliation.  *Curtis*, 807 F.3d at 221.

In an effort to demonstrate a causal link between the two events, Ciesielski argues that Chase's purported reasons for terminating him—largely articulated in his recurrent negative reviews from the first quarter of 2013, onward—were parts of a chain of pretextual justification for his ultimate termination.  But based on the undisputed facts, this argument fails as a matter of law.  It is true that Janda's criticism became more harshly worded and voluminous over time, with less positive feedback, but changes like those do not by themselves support an inference of retaliation.  *See, e.g.*, *Simpson v. Ofc. of Chief Judge of Cir. Ct. of Will Cty.*, 559 F.3d 706, 715 (7th Cir. 2009).

In *Simpson*, a former employee argued that the timing of the disciplinary action taken against her and the fact that she had never been disciplined or received a

negative review evinced the employer's retaliatory intent. *See id.* The Seventh Circuit disagreed, pointing to the temporal distance between the disciplinary action and the protected activity, and the order in which they begun. *See id.* ("[Simpson's] audit began in July; Simpson took leave in October"). The Seventh Circuit also pointed to the lack of evidence showing a discriminatory animus, discrediting the contention that negative performance reviews where there had been none previously should raise an inference of termination for improper reasons. Indeed, "[a]n employer's perception of an employee's performance can change, and might sometimes change dramatically." *Id.* at 718.

Here, the undisputed evidence demonstrates that Ciesielski failed to meet the goals set for him under the 30/60/90 day plan. Ciesielski points to other aspects of his performance that Janda failed to highlight in his negative reviews. This misses the point. Chase does not contend that Ciesielski was completely incompetent at his job. Rather, it contents that he did not achieve the output goals required of him by his supervisor. The status of those goals—not any that Ciesielski set for himself—are the performance metrics that the record reflects mattered to Chase.

As described in an earlier section of this opinion, Ciesielski readily admits that he failed to rise to his employer's expectations in some respects (dropping calls, coming in late, taking unapproved absences, etc.) even *after* being placed on the PIP. No reasonable jury could find that Ciesielski's reviews got progressively worse for any reason other than the undisputed fact that he failed to improve according to the mandates of the 30/60/90 day plan.

In sum, Ciesielski presents no direct evidence from which a reasonable jury

could infer retaliatory intent and instead relies on circumstantial evidence. But the evidence he has offered presented does not allow for an inference of retaliatory termination. Most importantly, at the time of first quarter review meeting—which was the harshest of Ciesielski's tenure at Chase up to that point—neither Janda nor any of his superiors had any indication that Ciesielski's wife had cancer or that Ciesielski would need to take FMLA leave. As a result, no inference of suspicious timing can be drawn based on the first quarter review. And although the onset of his FMLA leave and his increasingly negative reviews were somewhat close in time, temporal proximity or suspicious timing is rarely sufficient, without more, to permit a reasonable jury to find retaliation. *See Curtis*, 807 F.3d at 221. As such, no reasonable jury could find that Chase's decisions to place Ciesielski on the PIP, give him negative performance reviews, and ultimately terminate him were based on illegitimate or discriminatory reasons related to his FMLA leave. To the contrary, Ciesielski admits to many of the employment issues Chase cites as reasons for his termination. Thus, like in his ADA claim, no reasonable jury could find that Ciesielski's termination was based on his FMLA leave. Summary judgment in Chase's favor is appropriate. .

### Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [dkt. no. 24].

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 21, 2016